In the

# United States Court of Appeals

## For the Seventh Circuit

No. 23-1838

TREVOR DAVIS,

*Plaintiff-Appellee,*

*v.*

CHRISTOPHER ALLEN,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Western District of Wisconsin.
No. 21-cv-565 — **William M. Conley**, *Judge.*

ARGUED FEBRUARY 7, 2024 — DECIDED AUGUST 14, 2024

Before WOOD,[*] LEE, and PRYOR, *Circuit Judges.*

PRYOR, *Circuit Judge*. Trevor Davis sued Deputy Christopher Allen of the Barron County Sheriff's Department under 42 U.S.C. § 1983, alleging that Deputy Allen violated his Fourth Amendment rights by using unreasonable and

---

[*] Circuit Judge Wood retired on May 1, 2024, and did not participate in the decision of this opinion, which is being resolved under 28 U.S.C. § 46(d) by a quorum of the panel.

excessive force to effectuate Davis's arrest. After some discovery, Deputy Allen moved for summary judgment, asserting that his use of his police dog Koda to locate and secure Davis was objectively reasonable under the circumstances. He also argued in the alternative that he was entitled to qualified immunity. The district court denied Deputy Allen's motion concluding that material facts around the "circumstances and timing" of the use of the police dog were in dispute and prevented it from finding that Deputy Allen was entitled to qualified immunity at the summary judgment stage. Deputy Allen now appeals the district court's ruling. For the reasons provided, we dismiss this appeal for lack of appellate jurisdiction.

## I.   BACKGROUND

### A. Factual Background

For purposes of this interlocutory appeal, we accept the facts assumed by the district court in its denial of summary judgment. *Strand v. Minchuk*, 910 F.3d 909, 912 (7th Cir. 2018). We also look to the undisputed evidence in the record, including the audio and video footage taken from Deputy Allen's body-worn camera. *See Day v. Wooten*, 947 F.3d 453, 456 (7th Cir. 2020) ("[W]hether we accept the district court's assumed facts or the plaintiff's version of the facts, we may also look to undisputed evidence in the record even if the district court did not consider it.").

At about 11:35 p.m. on May 9, 2019, the Barron County Sheriff's Department received information from an anonymous caller that Trevor Davis was at David Haseltine's property in Cameron, Wisconsin. Davis had several outstanding arrest warrants for violent felonies, including armed robbery,

strangulation and suffocation, and bail jumping. The Sheriff's Department sent Deputy Allen, Koda, Sergeant Darren Hodek, and other law enforcement officers to arrest him.

When the officers arrived at the Cameron property, Davis was sitting in his car in the driveway. When he noticed the officers' headlights, Davis fled, running about 30 feet into Haseltine's mobile home trailer. It was quite dark, so the officers did not see exactly where Davis went. But they suspected that he had entered the trailer. Haseltine, who was on probation for a drug conviction, spoke with Sgt. Hodek and Deputy Allen. Initially, Haseltine represented that he did not know Davis or where Davis might have gone. But after a few minutes, Haseltine partly recanted, stating that Davis had been there earlier to fix his car but he "just left" and "must have … ran that way." The officers informed Haseltine that because he was on probation they could search his residence. *See* WIS. STAT. § 973.09(1d).[1]

Believing that Davis was hidden and potentially armed inside the cramped trailer, Deputy Allen sent Koda in to secure

---

[1] This statute provides as follows:

> If a person is placed on probation for a felony … the person, his or her residence, and any property under his or her control may be searched by a law enforcement officer at any time during his or her period of supervision if the officer reasonably suspects that the person is committing, is about to commit, or has committed a crime or a violation of a condition of probation.

WIS. STAT. § 973.09(1d).

Davis.[2] Before releasing the police dog, however, Deputy Allen shouted from the trailer's doorway: "Sheriff K9. Announce yourself now or I will send the dog in the house. You will be bit. Sheriff K9. Final warning. If you're in the house, you need to announce yourself now or you will be bit." After a brief pause, Deputy Allen shouted again, "Final warning."

Davis heard Deputy Allen's warning but did not orally respond or make his presence known in any way. Unbeknownst to Deputy Allen, Davis was lying face-down in the trailer's back bedroom, with his head pointed toward the bedroom's doorway and his fingers interlaced over his head.

"Find him," Deputy Allen told Koda. Koda entered the trailer, located Davis in the bedroom, and bit his upper left arm just below the shoulder. Koda was trained in a "bite and hold" technique, meaning he would not release Davis until Deputy Allen ordered him to do so.

Almost immediately, Davis began screaming for help. Deputy Allen entered the trailer and yelled back: "Show me your hands. Do not fight my dog. Show me your hands. Do not fight my dog. Come out to me. Come out to me."

Davis, shrieking in pain, yelled back: "I can't, please help me … I can't … help me please, help I can't … I need your

---

[2] Understanding the trailer's interior layout is helpful, so we describe it in some detail. The front door opened into a combined entryway and living room. To the left of the front door was a kitchenette on one side of the trailer and a two-person dining area on the other. Just past the hybrid kitchen-dining area was a short, narrow hallway that dead-ended at the bathroom. On the left side of the bathroom was yet another doorway that led to the trailer's back bedroom. A person standing in the trailer's front doorway would be able to see into the bathroom, but not into the back bedroom.

help … I need your help … make him stop, my arm … look what he is doing to me … please help."

Standing just inside the trailer, Sgt. Hodek, who had followed Deputy Allen inside, was partly able to see Davis in the back bedroom. He informed Deputy Allen that he could only see Davis's head. As Davis was yelling for help, Deputy Allen continued shouting commands for Davis to come out.

About 40 seconds after sending Koda in, the officers began moving toward the back bedroom where they knew Davis to be based on his screams and Sgt. Hodek's visual confirmation. The officers approached the hallway, with Deputy Allen in front. Deputy Allen informed Sgt. Hodek that he could now see Davis's hands. Sergeant Hodek told Deputy Allen that he saw a knife in the kitchen area. Both officers had their weapons drawn; Deputy Allen had a handgun and Sgt. Hodek had an AR-15 rifle. Davis continued screaming for help; Deputy Allen continued to insist that Davis come out of the bedroom. Amidst his pleas, Davis howled that he could feel his muscles being torn from the bone.

The parties dispute what happened next. Deputy Allen states that as he was coming down the hallway he was able only to see Davis's face, one of his hands, and at times, his face and one of his hands. Even though Deputy Allen was continuing to command Davis to keep his hands where officers could see them, it appeared to Deputy Allen that Davis was jerking his arm away from Koda. The officers maintain there was not clear visibility from the entry of the trailer through the hallway to the bedroom where Davis was located.

Davis, for his part, challenges what Deputy Allen could see and when. Davis maintains that Deputy Allen could

clearly see Davis's hands and face from the trailer's kitchen area, that his hands were above his head, and that he was not holding a weapon. Davis contends that he kept his hands visibly extended above his head, except for when Koda was actively jerking it while biting him. Davis also maintains that when the officers finally arrived at the doorway to the bedroom, they could see the entire bedroom and that Davis was lying face-down on a mattress on the floor, with his hands behind his head and not reaching for anything. Agreeing that there were clothes and other belongings strewn about the room, Davis disagrees with the notion that he was not clearly visible to the officers or that he was attempting to resist.

The officers maintain that once they reached the threshold of the bedroom, they could not immediately enter because an immovable boxspring blocked the doorway, reducing the pathway to a 12-inch gap. To squeeze through the small opening, the officers needed to remove their Kevlar vests. Koda continued to bite Davis while the officers did this. Next, the officers entered the room one at a time—Deputy Allen first, then Sgt. Hodek. Sergeant Hodek provided cover with his AR-15 rifle as Deputy Allen squeezed into the room. When Deputy Allen finally reached Davis, his hands were on the back of his head and Koda was still holding Davis's arm.

Deputy Allen grabbed Koda by the collar and commanded the dog to let go of Davis's arm. Koda obeyed. Sergeant Hodek then handcuffed Davis, removed him from the trailer, and eventually called for an ambulance. As Davis was being brought outside, he heard an officer tell two bystanders that "this is what happens when you don't comply." Davis was taken by ambulance to a clinic and then by helicopter to a nearby hospital because of his injuries. Davis's arm remains

severely disfigured, and he now suffers constant, debilitating pain.

In total, about two minutes elapsed from the time that Deputy Allen released Koda into the trailer until Deputy Allen took physical control of Davis and commanded Koda to release Davis's arm.

**B. Procedural History**

Davis later filed suit against Deputy Allen, alleging that Deputy Allen's failure to recall Koda after Davis had surrendered constituted excessive force in violation of the Fourth Amendment. *See* 42 U.S.C. § 1983. After some discovery, Deputy Allen moved for summary judgment, arguing that his use of Koda to locate and secure Davis was reasonable and, even if not, he was entitled to qualified immunity because he did not violate clearly established law.

The district court largely denied the motion. First, the district court concluded that Deputy Allen's initial decision to use Koda to locate Davis inside the trailer was objectively reasonable. Neither party contests this conclusion on appeal, so we say no more about it.

Second, the district court found genuine material disputes of fact had to be resolved before the reasonableness of the timing of Deputy Allen's recall of Koda could be determined. The district court reasoned that this issue hinged on the extent of Deputy Allen's ability to see Davis, how Davis was complying with the officers' commands, and whether Davis had been subdued, and, if so, when.

To the court, if a jury resolved the disputed facts in Davis's favor, then a reasonable officer would have known that Davis had surrendered and thus no longer posed a sufficient threat

justifying Koda's continued bite. Under those circumstances, a reasonable officer would have known that he was constitutionally required to recall Koda sooner and recalibrate his use of force. In other words, the district court reasoned that if a jury agreed that Deputy Allen knew that Davis had been subdued because he was screaming for help, lying prostrate on the floor, with his hands raised over his head, and suffering from a severe injury, then that jury would be obligated to find Deputy Allen used excessive force by allowing Koda to continue to bite Davis until Deputy Allen had physical control of Davis. Without these material factual disputes resolved, however, the district court found that it could not conclude, as a matter of law, whether Davis continued to pose a "sufficient threat to justify continuing Koda's bites" or whether "Deputy Allen used excessive force by not calling off Koda sooner."

Relying on *Becker v. Elfreich*, 821 F.3d 920 (7th Cir. 2016), the district court also found it clearly established that police officers are not permitted to continue using "significant force" on a suspect who has been subdued, is attempting to surrender, or at most, is passively resisting. The district court concluded, however, that the same disputed facts surrounding the "circumstances and timing" of the bite and hold prevented the court from granting Deputy Allen qualified immunity. Based on the summary judgment record, the district court found Deputy Allen was not entitled to qualified immunity.

Deputy Allen seeks interlocutory review of that decision under 28 U.S.C. § 1291.

## II.  ANALYSIS

Our review of the district court's decision denying Deputy Allen qualified immunity is de novo.[3] *Smith v. Finkley*, 10 F.4th 725, 734 (7th Cir. 2021). The interlocutory nature of this appeal requires us to first consider our jurisdiction.

When a district court denies an assertion of qualified immunity, that decision may be a collateral order subject to interlocutory review. *Mitchell v. Forsyth*, 472 U.S. 511, 525–27 (1985). That's because qualified immunity is a shield from both trial and liability, so an essential aspect of qualified immunity is irretrievably lost if a government official is required to stand trial. *Id.* at 526–27. But not every denial of qualified immunity is immediately appealable. *Johnson v. Jones*, 515 U.S. 304, 313 (1995); *Behrens v. Pelletier*, 516 U.S. 299, 313 (1996). An interlocutory appeal of the denial is available to the extent it turns on a pure issue of law. *Stewardson v. Biggs*, 43 F.4th 732, 735–36 (7th Cir. 2022). If, however, the denial turns on disputed facts, then we lack jurisdiction to hear the interlocutory appeal. *Johnson*, 515 U.S. at 313; *Stinson v. Gauger*, 868 F.3d 516, 524 (7th Cir. 2017) (en banc). Thus, "our jurisdiction on interlocutory appeal extends to pure questions of law, not mixed questions of law and fact." *Smith*, 10 F.4th at 735.

Yet the line between abstract legal questions and fact-bound inquiries is not always readily apparent. *See id.* The

---

[3] Qualified immunity shields government officials from liability "unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time'" of the alleged violation. *District of Columbia v. Wesby*, 583 U.S. 48, 62–63 (2018) (citation omitted).

existence of disputed facts alone does not deprive us of juris-
diction; instead, the question is whether those disputed facts
affect the qualified immunity analysis. *Estate of Williams v.
Cline*, 902 F.3d 643, 649 (7th Cir. 2018). If we can decide the
appeal without resolving disputed facts, then we can proceed
to the merits. *E.g.*, *Strand*, 910 F.3d at 913–14 ("In answering
whether a police officer is entitled to qualified immunity as a
matter of law, we must avoid resolving contested factual mat-
ters. If we detect a back-door effort to contest facts on appeal,
we lack jurisdiction." (internal citations and quotations omit-
ted)); *Lovett v. Herbert*, 907 F.3d 986, 991 (7th Cir. 2018). But if
not, we must dismiss the appeal for lack of jurisdiction. *Stew-
ardson*, 43 F.4th at 735; *Bayon v. Berkebile*, 29 F.4th 850, 854 (7th
Cir. 2022).

Two factors guide our analysis of whether Deputy Allen's
qualified immunity arguments turn on legal issues only.
*Smith*, 10 F.4th at 735–36. First, we closely examine whether
the district court identified disputes of fact as the basis for
denying qualified immunity. *Id.* at 736. And, second, we con-
sider whether the officer's arguments hinge on disputed facts.
*Id.* "When we answer yes to both questions, as we do here, we
lack jurisdiction over the appeal." *Stewardson*, 43 F.4th at 736.

### A. Whether There was a Constitutional Violation Hinges on Disputed Facts

Davis alleges that Deputy Allen used excessive force in vi-
olation of his Fourth Amendment rights. The district court
concluded that material disputes of fact precluded granting
Deputy Allen qualified immunity on this question at sum-
mary judgment.

The Fourth Amendment's reasonableness requirement applies when officers seize a person by physical force. *Torres v. Madrid*, 592 U.S. 306, 325 (2021); *Tennessee v. Garner*, 471 U.S. 1, 7 (1985). Whether a particular use of force is reasonable depends on the totality of the circumstances, *Garner*, 471 U.S. at 8–9, including the degree and immediacy of the threat posed by the suspect and whether the suspect was actively resisting or trying to evade arrest, *Graham v. Connor*, 490 U.S. 386, 396 (1989). Courts assess the reasonableness of the use of force from the perspective of a reasonable officer on the scene based on the information known to the officer at the time. *Id.*; *Burton v. City of Zion*, 901 F.3d 772, 780 (7th Cir. 2018).

Looking at these factors, the district court found that the parties' disputed facts pointed in both directions on whether Deputy Allen's use of force was reasonable. It also noted that these facts were material in deciding whether a reasonable officer would have determined sooner that "Davis had been subdued" or whether he continued to pose "a sufficient threat to justify continuing Koda's bites." In the district court's view, a jury needed to resolve the disputed facts before it could answer these questions.

As the district court explained, if a jury agreed with Davis's version of events, it "could find that as soon as [Deputy] Allen heard Davis screaming in pain and begging for help, a reasonable officer would have known that Davis could not comply with orders to come out while being actively bitten." Similarly, Davis's posture in the bedroom mattered because a "jury could conclude that upon seeing Davis laying on his stomach, with his hands raised and suffering from a serious injury, a reasonable officer would have ordered Koda to release Davis." In short, the district court concluded that the

reasonableness of Deputy Allen's actions (and inaction) turned on disputed facts.

We agree. Whether Davis posed a threat from the viewpoint of a reasonable officer standing at the threshold of the bedroom relies heavily on disputed facts. It is not until those facts are resolved by a jury are we are able to address the merits of the qualified immunity question. The parties agree that Davis was lying face-down with his hands raised over his head, but they dispute the extent and timing of Deputy Allen's ability to see Davis's posture. They dispute whether Deputy Allen knew that Davis could not comply with commands to exit the bedroom. They dispute whether Deputy Allen knew that Davis was unarmed. They also dispute the factual inferences to be drawn from Davis's posture and pleas and Deputy Allen's knowledge of both. But we cannot resolve contested facts or competing inferences on interlocutory appeal. *Smith*, 10 F.4th at 742. From a reasonable officer's perspective, and based on the totality of the circumstances, use of the police dog to secure Davis might not have continued to be warranted when the officers arrived at the bedroom. But to address this question, we would have to resolve disputes about the sufficiency of the evidence, which we cannot do for purposes of this interlocutory appeal. *Id.* at 741 (resolving factual disputes requires evaluating the quantity and quality and not simply ruling on an abstract legal question).

Wanting to secure appellate jurisdiction over this interlocutory appeal, Deputy Allen maintains that he concedes Davis's version of events is correct. But his arguments ultimately depend on—and cannot be separated from—disputed facts, which confirms our lack of jurisdiction. *See Smith*, 10 F.4th at 736.

For us to reach the merits of the qualified immunity issue, Deputy Allen would have to concede several essential facts that inform the reasonableness of his decision not to recall Koda sooner, including that (1) Deputy Allen could see Davis's prostrate posture shortly after he entered the trailer; (2) Deputy Allen could see Davis's hands at all times thereafter; (3) Deputy Allen could see that Davis was unarmed; (4) Deputy Allen could also see the entire bedroom and Davis's entire body from the threshold of the bedroom; (5) Davis could not physically comply with Deputy Allen's commands to leave the bedroom; (6) Davis's arm movement was caused by Koda continuing to bite him; and (7) Deputy Allen saw Koda had inflicted a serious injury to Davis's arm. These facts and inferences matter because they inform how a reasonable officer in these circumstances would have responded to the threat, or lack thereof, that Davis posed. *Graham*, 490 U.S. at 396.

For purposes of this appeal, Deputy Allen argues that "[n]othing that happened between when Koda first took hold of Davis's arm and when [the officers] were able to physically access the room" suggested that it was objectively reasonable to recall Koda and reassess the use of force.[4] Deputy Allen contends that he could not see Davis's hands and that, anyway, the room was cluttered and Davis might have hidden a weapon, so a reasonable officer would perceive an ongoing threat sufficient to warrant Koda's continued deployment.[5] But his sheer speculation that, despite the officers' armed presence, Davis might have abandoned his surrender and tried to find a hidden weapon does not overcome the need for

---

[4] Allen's Br., at 20.

[5] *Id.* at 22–26.

a fact-intensive inquiry. In every felony arrest there is a risk that the suspect could access a weapon, but that does not give officers free rein to continue inflicting significant force on a subdued, compliant suspect. *E.g.*, *Becker*, 821 F.3d at 927–28. The parties' factual disputes over what happened and how it happened are centrally relevant to the question of whether Deputy Allen used excessive force in arresting Davis in violation of the Fourth Amendment.

### B. Whether Deputy Allen Violated Clearly Established Law Depends on Disputed Facts

The parties' disputed facts are also inextricably bound up with the question of whether Deputy Allen violated clearly established law. For if Davis had surrendered and Deputy Allen knew it, then Deputy Allen was constitutionally required to recall Koda and recalibrate. *See Abbott v. Sangamon County*, 705 F.3d 706, 732 (7th Cir. 2013). We have long held that officers must use force that is reasonably proportionate to the threat the suspect poses. *Alicea v. Thomas*, 815 F.3d 283, 292 (7th Cir. 2016) (noting that "[c]ommanding a dog to attack a suspect who is already complying with orders" violates clearly established law); *Cyrus v. Town of Mukwonago*, 624 F.3d 856, 863 (7th Cir. 2010). It is "well-established" that "police officers cannot continue to use force once a suspect is subdued." *Becker*, 821 F.3d at 928–29; *see also Miller v. Gonzalez*, 761 F.3d 822, 829 (7th Cir. 2014); *Abbott*, 705 F.3d at 732; *Johnson v. Scott*, 576 F.3d 658, 660 (7th Cir. 2009).

We point out this legal backdrop not to resolve the qualified immunity question but to underscore that the disputed facts here are essential to, and inseparable from, any resolution of this interlocutory appeal. For us to weigh in on the appropriateness of qualified immunity, we would have to

resolve the parties' factual disputes first. This we cannot do. *Smith*, 10 F.4th at 736, 747; *Stewardson*, 43 F.4th at 734; *Bayon*, 29 F.4th at 854.

Developments at trial may reveal that qualified immunity is appropriate. *See Ferguson v. McDonough*, 13 F.4th 574, 584 (7th Cir. 2021). But a jury must resolve the parties' factual disputes first. *See id.*

### III.    CONCLUSION

For these reasons, we DISMISS this appeal for lack of appellate jurisdiction.