In the

# United States Court of Appeals
## For the Seventh Circuit

———————————

Nos. 24-1048 and 24-1082

ERIKA MABES and BRIAN MABES, individually and on behalf
of L.M., J.R.M., and J.A.M., minor children,

*Plaintiffs-Appellees*,

*v.*

SHANNON THOMPSON, *et al.*,

*Defendants-Appellants*.

———————————

Appeals from the United States District Court for
the Southern District of Indiana, Indianapolis Division.
No. 1:21-cv-02062-JRS-MKK — **James R. Sweeney II,** *Judge.*

———————————

ARGUED DECEMBER 12, 2024 — DECIDED APRIL 28, 2025

———————————

Before RIPPLE, SCUDDER, and MALDONADO, *Circuit Judges*.

SCUDDER, *Circuit Judge*. This case arose out of tragic circumstances. In July 2019 Indiana Department of Child Services workers encountered a two-month-old infant with a severe skull fracture and extensive brain damage after being taken to an emergency room by his parents who had discovered him unresponsive and struggling to breathe. And so began lengthy child abuse and custody proceedings against the

parents of the child, Erika and Brian Mabes. The Mabeses ultimately regained custody of the infant and their other two children and sued nine Indiana DCS workers and a consultant doctor at the hospital, invoking 42 U.S.C. § 1983 and alleging violations of their Fourth and Fourteenth Amendment rights under the Constitution.

The district court denied the defendants' motions for summary judgment because it found that unresolved factual disputes precluded their requests for qualified immunity. The defendants now appeal. After conducting our own review of the factual record and evaluating each defendant and claim individually, as the law of qualified immunity demands, we reverse.

## I

### A

Because this appeal comes to us from the district court's denial of qualified immunity, we accept the plaintiffs' version of the facts as true. See *Smith v. Finkley*, 10 F.4th 725, 735–36 (7th Cir. 2021).

Shortly after midnight on July 20, 2019, Brian Mabes dozed off while watching his two-month-old twin sons. He awoke to find one of the twins, L.M., struggling to breathe and unresponsive. L.M. had been fussy that night, so to ease the infant's discomfort, Brian placed him on his stomach on a soft memory-foam mattress—an unsafe sleeping arrangement, all parties seem to agree.

After waiting to see if L.M.'s condition would improve, Brian woke up his wife Erika, a fellow at Indiana University training to become a pediatric plastic surgeon. The couple called 911 and emergency responders transported L.M. to a

nearby regional hospital. Shortly after his arrival, L.M. began vomiting and aspirating. The doctors administered CPR and attempted to intubate L.M. multiple times. According to the Mabeses, L.M. was without oxygen for at least 12 minutes.

After stabilizing L.M., the medical team arranged a lifeline transfer by helicopter to Riley Hospital for Children, a specialty hospital in Indianapolis. A CT scan taken upon L.M.'s arrival showed extensive brain damage in addition to a significant Y-shaped fracture on his skull. Doctors also observed abdominal bruising. Although the Riley team managed to stabilize the infant, L.M. remained in critical condition with a grave prognosis.

The Riley doctors reported L.M.'s condition to the Indiana Department of Child Services, which enlisted Dr. Shannon Thompson, a member of Indiana University School of Medicine's child protection program division, as a consultant. In her role as a DCS consultant, Dr. Thompson had the ability to order tests and conduct medical evaluations. DCS also dispatched Natasha Davis and Courtney Oakes, the family case managers on call that night, to investigate.

Davis and Oakes interviewed Brian and Erika Mabes at Riley Hospital. They asked how L.M. might have sustained his injuries. With respect to his abdominal bruising, Erika noted that L.M. "bruised easily when swaddled." As for his head injury, Erika explained that L.M. had developed a "goose egg" on his head the prior month and suggested that his three-year-old brother, J.A.M., may have hit him on the head with a plastic toy or perhaps L.M. had been accidentally bumped into a wall. Because L.M. was otherwise asymptomatic at the time, the Mabeses had not sought medical assistance for the goose egg. Brian reported that Erika had taken

L.M. to the emergency room about a week before the July 20 incident because he was vomiting profusely. The ER physicians advised Erika that L.M. had a stomach illness.

While Davis remained at the hospital to interview Erika alongside Dr. Thompson, Oakes went to the Mabes family home, accompanied by law enforcement. With Brian's consent, police officers searched the home and discovered marijuana and associated paraphernalia, as well as medications that had been prescribed to Erika's deceased father. Oakes confronted Brian about the drugs, and he admitted to using marijuana. (The parties dispute whether Brian further admitted to using marijuana at times when he was the only parent watching the children.)

Dr. Thompson provided her initial findings to Case Managers Davis and Oakes on the afternoon of July 20 and classified the case as "intermediate, highly suspicious for non-accidental injury," because of the parents' inability to provide an explanation that matched L.M.'s injuries. Dr. Thompson also recounted showing Erika the scan of L.M.'s skull fracture, to which Erika remarked, "Oh my gosh, it's almost half of his skull." Shortly after meeting with Erika, Dr. Thompson advised Davis that a skull fracture of this type and size could not have resulted from being hit in the head with a plastic toy or contact with a corner of a wall. Erika, however, offered no alternative explanation.

Case Managers Davis and Oakes communicated their findings with their supervisor at DCS, Hannah Lyman, who decided to remove all three of the Mabeses' children—the two-month-old twins, L.M. and J.R.M., and the couple's three-year-old, J.A.M.—on an emergency basis. Because L.M.'s medical emergency occurred early on a Saturday morning

when no judge was on call, DCS did not attempt to secure a court order before removing the children from the Mabeses' home.

Two days later, on Monday, July 22, Davis—acting under Lyman's supervision—submitted a Petition to declare the Mabeses' children as "children in need of services" (a CHINS Petition) to the Indiana court. At a hearing that afternoon, the court issued an order approving DCS's custody of the children. Brian and Erika Mabes attended the hearing, represented by separate counsel.

That same day DCS reassigned the case from Oakes and Davis to Angela McFeeley, another Case Manager, who took over the investigation on a permanent basis. In the weeks that followed, doctors conducted additional physical exams of L.M. and found several fractured ribs, which Dr. Thompson opined did not occur as a result of the CPR administered at the regional hospital. Dr. Thompson also identified a fracture in L.M.'s arm and several areas where the child's limbs had been dislocated.

Dr. Thompson ordered examinations of the other two children, and the Riley medical team identified what they believed to be a partially healed skull fracture on the head of the other two-month-old, J.R.M. But upon a later reevaluation, Dr. Thompson clarified that she found J.R.M.'s CT scan to be "indeterminate for abuse" because she could not rule out that the previously identified fracture was a nutrient vessel, which would be inconsistent with a traumatic injury.

In October 2019, following several months of investigation, DCS informed Erika Mabes that it intended to substantiate allegations of abuse and neglect against her as L.M.'s

mother. To advance such a claim against a caregiver, DCS must conclude that it has sufficient information to prove by "a preponderance of evidence that child abuse or neglect has occurred." Ind. Code § 31-9-2-123. When DCS substantiates a claim of abuse, the caregiver faces several negative consequences, including placement on the public child protective index.

Later the same month, as part of an agreement with DCS, Brian and Erika Mabes admitted that their three children qualified as children in need of services, requiring the court's coercive intervention, "as a result of the Father's neglect to supply the children with necessary services." The agreed stipulation continued "no determinations [had been made] in regard to the mother."

Because Erika Mabes's work as a physician qualified her as a childcare worker, Indiana law provided her with a "Child Care Worker Assessment Review Process," before DCS could move forward with formally substantiating its allegations. This Review Process must be conducted by a person "who was not involved in the assessment or the preparation of the assessment report, and does not have a conflict of interest." Courtney Crowe, the local DCS office director, conducted the first Review Process and substantiated the abuse against Erika.

Erika appealed the determination, claiming that Crowe was not qualified to conduct the review due to her involvement in the decision to substantiate the abuse allegations. Erika's appeal was successful so a new Review Process commenced and concluded with a new reviewing officer likewise substantiating the allegations of abuse and neglect against Erika. She appealed again, but in February 2022, the central

DCS office elected to unsubstantiate all allegations against Erika while her appeal was still pending because it found that DCS lacked sufficient evidence to substantiate the allegations.

B

The Mabeses then invoked 42 U.S.C. § 1983 and filed suit in federal court in Indianapolis against Dr. Thompson and nine DCS employees. The first claim arises from the initial seizure of the three children, which the Mabeses contend violated both the children's Fourth Amendment right against unlawful seizures as well as the parents' Fourteenth Amendment substantive and procedural due process rights. Next, the Mabeses allege that several of the DCS workers misrepresented facts in the CHINS Petition, violating their procedural due process rights under the Fourteenth Amendment. Finally, the Mabeses claim that the defendants violated their procedural due process rights in the subsequent child abuse proceedings by refusing to consider mitigating evidence and having a DCS employee (Courtney Crowe) with a conflict of interest conduct a Child Care Worker Assessment Review Process. The Mabeses raise each of these claims against Dr. Thompson as well.

Dr. Thompson and the DCS defendants separately moved for summary judgment. Both sets of defendants invoked qualified immunity, contending that their actions did not violate the Mabeses' clearly established rights. The district court denied both motions, determining that factual issues precluded any award of qualified immunity to any defendant.

All ten defendants now appeal.

## II

### A

We begin with a word on our jurisdiction. As a general matter, Congress has limited our appellate jurisdiction to reviewing "final decisions of the district courts." 28 U.S.C. § 1291. The Supreme Court has recognized that a denial of qualified immunity, "to the extent that [the denial] turns on an issue of law," qualifies as a "final decision" subject to appellate review. See *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985). Appellate review, then, is available only where the appeal focuses "exclusively on legal questions about immunity, rather than factual disputes tied up with the merits of the case." *Jones v. Clark*, 630 F.3d 677, 679 (7th Cir. 2011).

To be sure, the mere existence of some disputed facts does not deprive us of jurisdiction. Instead, the question is whether those disputed facts affect the qualified immunity analysis. See *Estate of Williams v. Cline*, 902 F.3d 643, 649 (7th Cir. 2018). "If we can decide the appeal without resolving disputed facts, then we can proceed to the merits." *Davis v. Allen*, 112 F.4th 487, 493 (7th Cir. 2024). If not, we must dismiss the appeal for lack of jurisdiction. See *Finkley*, 10 F.4th at 750.

The Mabeses contend that we lack jurisdiction to resolve this appeal because the defendants' arguments turn on disputed facts. No doubt "the line between abstract legal questions and fact-bound inquiries is not always readily apparent." *Davis*, 112 F.4th at 492. And there is no shortage of different perspectives in this case. But the defendants make clear that, for purposes of this appeal, they accept the plaintiffs' version of events as true. See *Manery v. Lee*, 124 F.4th 1073, 1078–79 (7th Cir. 2025); *Jones*, 630 F.3d at 680.

We see no reason to dismiss this appeal for lack of jurisdiction because, after undertaking our own careful review of the record, and viewing the facts in the light most favorable to the Mabeses as plaintiffs, we can resolve the defendants' assertion of qualified immunity on the merits. See *Johnson v. Jones*, 515 U.S. 304, 319 (1995) (explaining that, where the district court does not "state those facts" which led to the denial of qualified immunity, courts of appeals may review that legal determination by "undertak[ing] a cumbersome review of the record" and evaluating the facts "in the light most favorable to the nonmoving party").

### B

"[Q]ualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Upon a defendant's invocation of qualified immunity at summary judgment, the plaintiff shoulders the burden of demonstrating both that the defendant violated a constitutional right and that the constitutional right was clearly established at the time, such that "a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). For the latter inquiry, "the clearly established law must be 'particularized' to the facts of the case." *White v. Pauly*, 580 U.S. 73, 79 (2017) (quoting *Anderson,* 483 U.S. at 640); see also *Sabo v. Erickson*, 128 F.4th 836, 844 (7th Cir. 2025) (en banc). We review denials of qualified immunity without deference to the district court and cabin our review to legal questions. See *Taylor v. Ways*, 999 F.3d 478, 487 (7th Cir. 2021).

Because qualified immunity is an affirmative defense "available to each individual defendant in his individual capacity," a court must structure its analysis defendant-by-defendant and claim-by-claim. *Cline*, 902 F.3d at 651 (quoting *Bakalis v. Golembeski*, 35 F.3d 318, 326–27 (7th Cir. 1994)). And this is especially important where, as here, the plaintiffs advance multiple claims against multiple defendants. See *id.* (describing the "painstaking commitment to an individualized qualified-immunity analysis" that our case law demands).

The district court did not approach its own qualified immunity assessment this way. To our eye, we see the district court's analysis as painting with too broad a brush. The district court concluded that *none* of the ten defendants were entitled to qualified immunity because the case "could turn on a single disputed factual question of credibility: ought DCS and Dr. Thompson to have had second thoughts?" But whether it might have been a "mistake[] in judgment" to remove the children and substantiate abuse allegations against the Mabeses does not broadly resolve whether any particular defendant is entitled to qualified immunity on any particular claim. *Pearson*, 555 U.S. at 231 (citation omitted). The district court had a duty to focus on each claim and "determine whether *each* defendant violated [the Mabeses'] rights and, if so, whether that right, defined at an appropriate level of specificity, was clearly established at the time." *Cline*, 902 F.3d at 651.

### III

We begin our assessment of qualified immunity with Dr. Shannon Thompson, the child abuse specialist at Riley Hospital, who assessed the children and provided her medical

opinion to DCS throughout its investigation. The Mabeses' theory of liability as to Dr. Thompson is not that she caused their injuries in ordering certain tests and reaching particular medical conclusions, but rather that she provided advice to DCS which set in motion a series of events that ultimately led to the various alleged constitutional deprivations. So even though Dr. Thompson did not engage in any of the actions that the Mabeses allege violated their constitutional rights—removing the children, preparing the CHINS Petition, and the like—they nonetheless urge us to affirm the denial of qualified immunity because Dr. Thompson "knew" that DCS would rely on her "recklessly" incorrect opinion in making the decision to remove the children. We disagree and conclude that Dr. Thompson is entitled to qualified immunity.

Dr. Thompson is situated differently than the other defendants. At all relevant times, she acted as a medical professional and, unlike DCS employees, did not have any decision-making authority or direct control over the child abuse investigation. It should not be surprising, then, that the Mabeses point to no analogous case establishing that a physician violates an individual's constitutional rights by offering a medical opinion to state child welfare officials, even if the opinion later proves incorrect. See, *e.g.*, *Brown v. Osmundson*, 38 F.4th 545, 550 (7th Cir. 2022) (explaining that, in the context of an Eighth Amendment prison medical care claim, medical malpractice, without more, does not rise to the level of a constitutional violation).

Recognizing this deficit, the Mabeses attempt to reframe the inquiry to remove Dr. Thompson's lack of personal involvement and status as a physician from the qualified immunity question, describing her direct participation in the

constitutional violations (or lack thereof) as "irrelevant." As the Mabeses see things, our statement in *Brokaw v. Mercer County* that "[a]n official causes a constitutional violation if he sets in motion a series of events that defendant knew or reasonably should have known would cause others to deprive plaintiff of constitutional rights" makes this case an easy one: Dr. Thompson's medical opinion that L.M.'s injuries were consistent with abuse led to the removal of the children and other ensuing constitutional violations, so, the argument continues, a jury could choose to find Dr. Thompson liable on *all* of the plaintiffs' claims. 235 F.3d 1000, 1012 (7th Cir. 2000).

Not so in our view. For one, the passage from *Brokaw* explains when an individual may be considered personally liable for a constitutional violation under § 1983—it says nothing about whether the rights the Mabeses claim Dr. Thompson violated were clearly established in July 2019. These are separate inquiries, and the Mabeses, as plaintiffs, bear the burden to prove both: that Dr. Thompson "caused the deprivation of a constitutional right," *and* that the constitutional right was "clearly established at the time." *Surita v. Hyde*, 665 F.3d 860, 868, 875 (7th Cir. 2011) (explaining that "[t]o be liable under § 1983, a government official must have caused the deprivation of a constitutional right") (citing *Brokaw*, 235 F.3d at 1012)). Put most simply, the Mabeses cannot side-step their burden to identify "a closely analogous case" clearly establishing the constitutional right they claim Dr. Thompson violated by invoking *Brokaw*'s broad language describing § 1983's causation standard. *Reed v. Palmer*, 906 F.3d 540, 547 (7th Cir. 2018) (quoting *Findlay v. Lendermon*, 722 F.3d 895, 899 (7th Cir. 2013)).

In any event, we see no evidence in the record (or identified in the Mabeses' brief), that Dr. Thompson acted in a reckless or otherwise improper manner in providing her recommendation to DCS. To the contrary, the record shows that she acted reasonably at all points in time. Remember the grave and urgent situation that Dr. Thompson confronted on July 20, 2019: a two-month-old infant arrived at Riley Hospital with significant brain trauma and a severe skull fracture, among other injuries, after almost dying while being intubated at another hospital. While the Mabeses take Dr. Thompson to task for her medical evaluation, contending that she failed to consider mitigating evidence (namely, the possibility that L.M.'s injuries were the result of failed resuscitation attempts at the regional hospital), among other shortcomings, they have not established that Dr. Thompson was on notice that any aspect of her interactions with DCS was unlawful or unreasonable in light of the difficult and uncertain circumstances she encountered with L.M.

Qualified immunity "'gives ample room for mistaken judgments,' by protecting 'all but the plainly incompetent or those who knowingly violate the law,'" neither of which is a fair descriptor of Dr. Thompson—particularly in light of the circumstances she confronted at the hospital. *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (citation omitted). Dr. Thompson's entitlement to qualified immunity naturally follows from the Mabeses' failure to carry their "burden of demonstrating the violation of a clearly established right." *Forman v. Richmond Police Dep't*, 104 F.3d 950, 957–58 (7th Cir. 1997). The Mabeses have identified no precedent (and we are aware of none) establishing that a medical professional violates an individual's constitutional rights by providing a medical opinion to DCS,

even if that opinion, in hindsight, was incorrect, compelling our conclusion that Dr. Thompson is immune from suit.

## IV

We turn next to the nine DCS defendants, each of whom had varying involvement in the investigation and adjudication of the child abuse allegations against the Mabeses. We take each of the plaintiffs' claims in turn and conclude that none of the defendants violated the Mabeses' clearly established rights, entitling the DCS defendants to qualified immunity across the board.

## A

The Mabeses allege that Natasha Davis and Courtney Oakes (the two family Case Managers on call when L.M. arrived at Riley Hospital), Hannah Lyman (their supervisor), and Courtney Crowe (the DCS office director) took custody of their three children in violation of the children's Fourth Amendment right against unreasonable seizure, as well as Brian's and Erika's Fourteenth Amendment rights to procedural due process and substantive due process, specifically their right to familial relations.

Taking the unreasonable seizure claim first, we have explained that "a seizure is reasonable if it is pursuant to a court order, if it is supported by probable cause, or if it is justified by exigent circumstances, meaning that state officers 'have reason to believe that life or limb is in immediate jeopardy.'" *Brokaw*, 235 F.3d at 1010 (citation omitted). Although Hannah Lyman did not secure a court order prior to removing the children from the Mabeses' custody—the Indiana court's authorization came two days later—she claims the seizure was

nevertheless reasonable because it was supported by probable cause.

Probable cause is an objective inquiry, focused in these circumstances on whether "a prudent caseworker (meaning one of reasonable caution) could have believed that [the children] faced an immediate threat of abuse." *Siliven v. Ind. Dep't of Child Servs.*, 635 F.3d 921, 927 (7th Cir. 2011). Applying this standard in the context of qualified immunity, Davis, Oakes, Lyman, and Crowe are entitled to immunity "as long as a reasonable [DCS] investigator … could have believed [the removal was] lawful, in light of clearly established law and the information [they] possessed" at the time. *Hernandez ex rel. Hernandez v. Foster*, 657 F.3d 463, 475 (7th Cir. 2011) (internal quotation marks omitted).

Upon viewing the facts in the light most favorable to the Mabeses, as we must, we have little difficulty concluding that standard is met here. By the afternoon of July 20, 2019, Case Managers Davis and Oakes were investigating the "near fatality" of a two-month-old infant following an unexplained medical emergency. They had discovered evidence of unsafe sleep practices and drug use by one of the parents during a home visit. Even more, Dr. Thompson, a certified child abuse specialist, advised Davis that Erika Mabes failed to provide an explanation consistent with L.M.'s injuries. Indeed, Dr. Thompson told Davis that she considered the case "highly suspicious for non-accidental injury." Davis and Oakes communicated these findings to their supervisor, Hannah Lyman, who ultimately ordered the children's removal.

The Mabeses seek to diminish the severity of L.M.'s physical condition when the child arrived at Riley Hospital, describing the child's abdominal bruising as "insignificant," and

the skull fracture as "clearly old." But their after-the-fact say-so does nothing to negate the uncertainty and urgency of the situation Case Managers Davis and Oakes faced in July 2019. See *United States v. 5443 Suffield Terrace*, 607 F.3d 504, 510 (7th Cir. 2010) (explaining that "saying so doesn't make it so" to create a genuine dispute of fact at summary judgment). And regardless of any genuine dispute about the severity of L.M.'s injuries, we conclude that a reasonable DCS investigator could have believed that removing the Mabeses' children was lawful at the time—with an eye toward assuring their safety while the investigation progressed.

This conclusion finds ample support in our case law. Indeed, we have granted DCS employees immunity in cases where the facts were less stark and severe than the ones before us. See, *e.g.*, *Hernandez*, 657 F.3d at 475–77 (finding that child protection workers were entitled to qualified immunity where DCS seized a fifteen-month-old child with a broken arm after the parents provided "seemingly inconsistent statements," even though a home visit uncovered "nothing … suspicious"); *Xiong v. Wagner*, 700 F.3d 282, 290 (7th Cir. 2012) (granting child welfare workers qualified immunity where the child's school contacted DCS after discovering bruises on the child's arm and leg, which the child said had been inflicted by his parents, and the parents admitted to leaving him home alone for extended periods of time).

The Mabeses try to distinguish our opinion in *Hernandez*. They explain that, unlike in *Hernandez*, their children were not in Brian's and Erika's custody at the time DCS ordered their removal—they were being watched by extended family. And, from that observation, the Mabeses contend that their children did not face any risk of imminent abuse. But we have

never held that a DCS employee cannot order a child's removal, where it otherwise had probable cause to do so, simply because the child is presently residing with another adult. The state-sanctioned removal of a child deprives a parent of their right to *legal custody* over the child, not merely physical custody.

Our conclusion that Davis, Oakes, Lyman, and Crowe are immune from suit on the children's Fourth Amendment unreasonable seizure claim also serves to dispose of Erika and Brian Mabeses' Fourteenth Amendment procedural due process claim, as we apply the same probable cause standard to both. See *Hernandez*, 657 F.3d at 486 ("[G]overnment officials may remove a child from his home without a pre-deprivation hearing and court order if the official has probable cause to believe that the child is in imminent danger of abuse.").

As for the Mabeses' claim that Davis, Oakes, Lyman, and Crowe violated their Fourteenth Amendment right to familial relations, the standard is even lower, requiring only that a caseworker have "some definite and articulable evidence giving rise to a reasonable suspicion" of danger to the child before separating them from their parents. *Brokaw*, 235 F.3d at 1019. The lesser standard makes our analysis straightforward: because we have concluded that a reasonable DCS worker could have believed probable cause existed to seize the children, the defendants are entitled to qualified immunity on the Mabeses' substantive due process claim as well. See *Siliven*, 635 F.3d at 928 (explaining that where the court already "concluded that the evidence was sufficient to establish probable cause" it followed that the evidence "must also be sufficient to satisfy the less demanding reasonable suspicion standard").

In the end, our analysis roots itself in the recognition that "child welfare caseworkers are often called upon to make difficult decisions without the benefit of extended deliberation." *Doe v. Heck*, 327 F.3d 492, 525 (7th Cir. 2003); see also *Brokaw*, 235 F.3d at 1023 (recognizing that "it is generally the case" that "social workers and other state actors who cause a child's removal are entitled to qualified immunity because the alleged constitutional violation will rarely—if ever—be clearly established"). This case fits that bill to a T, with state officials having to make tough calls under substantial time pressure. So while we are sympathetic to the Mabeses' genuine distress at DCS's decision to seize their children, we cannot conclude that Natasha Davis, Courtney Oakes, Hannah Lyman, or Courtney Crowe violated their clearly established constitutional rights.

B

We turn next to the Mabeses' procedural due process claim arising from the CHINS Petition. Erika and Brian assert that several DCS defendants violated their constitutional rights by submitting the Petition to an Indiana court with misrepresentations of fact and omissions of critical information, which led to the temporary loss of their three children. The Mabeses brought their claim against Case Managers Davis and Oakes, Lyman (their supervisor), and Crowe (the office director). On appeal, however, the Mabeses only refer to Davis, Oakes, and Lyman, pressing no contentions relating to Crowe's involvement. So we dispose of any claims against Crowe and focus our analysis on Davis, Oakes, and Lyman.

"[D]ue process 'at a minimum … requires that government officials not misrepresent the facts in order to obtain the removal of a child from his parents.'" *Hernandez*, 657 F.3d at

484–85 (quoting *Brokaw*, 235 F.3d at 1020). The Mabeses claim that the CHINS Petition is replete with such misrepresentations, including that "L.M. had a 'life-threatening' skull fracture and bruise," that "the only explanation given [by the Mabeses] for the [abdominal] bruise was swaddling," and that "L.M. presently had a goose egg." Accepting the Mabeses' views that these statements and omissions were misleading, the three defendants at issue are still entitled to qualified immunity on the procedural due process claim. It is not clearly established that officials categorically may not make *any* misstatements of fact in a CHINS Petition. And considering the expedited basis on which the defendants filed the Petition and the immateriality of these alleged misstatements to the removal determination, we cannot conclude these DCS workers should have reasonably understood that their actions violated the law.

The Mabeses rely heavily on our decision in *Brokaw*, where we first held that government officials may not misrepresent facts to secure a child's removal. See 235 F.3d at 1020. But *Brokaw* is not "particularized to the facts of [this] case." *Pauly*, 580 U.S. at 79. There the plaintiff, who had been removed from his parents as a child, alleged that the entire proceeding to secure his removal was a sham, with no merit to any of it.

The Mabeses make no such claim here, nor could they. The preliminary inquiry submitted to the state court consists of almost 50 pages of narrative, setting out the basis for DCS's probable cause assessment and chronicling the investigation to that point in time. The Mabeses do not challenge the accuracy of most of the report. Instead, they draw out, with a relatively fine-toothed comb, seven alleged misstatements and omissions by DCS. But even if the Mabeses are correct that

these specific statements are misleading, unlike *Brokaw*, many of them came from medical professionals who provided their assessment of L.M.'s condition to DCS. And we have recognized that state officials may reasonably rely on the judgment of medical professionals without exposing themselves to liability. See *McGee v. Adams*, 721 F.3d 474, 483 (7th Cir. 2013) (applying this principle in the context of an Eighth Amendment deliberate indifference claim).

It also matters that Brian and Erika were both present at the deprivation hearing and represented by counsel when the state court, relying upon the information contained in the CHINS Petition, authorized the removal of the three children. The facts here stand in stark contrast to *Brokaw*, where it appears the decision to remove the child came after an *ex parte* meeting with law enforcement, a DCS employee, and a judge present. 235 F.3d at 1007. Further, the plaintiff in *Brokaw* claimed that the state presented a report containing false information at a subsequent hearing and that his parents "were denied the opportunity to disprove those allegations because they were not given access to the report" in advance. *Id.* at 1008. It was against these facts that we identified a procedural due process claim.

Here, however, the Mabeses had every opportunity in the CHINS proceeding to clarify a misstatement of fact, with the court telling them "you're certainly welcome" "to make an argument about why I shouldn't detain these children." And, unlike the report in *Brokaw*, DCS prepared the CHINS Petition and preliminary inquiry within one day of DCS first making contact with the Mabes family. These factual dissimilarities lead us to conclude that *Brokaw* did not clearly establish that *any* misstatement of fact in a petition for the removal of a child

violates a parent's procedural due process right—particularly where, as here, DCS prepared the CHINS Petition on an expedited basis and the parents had the opportunity to object.

In any event, the CHINS report did not run afoul of *Brokaw*'s conclusion that a state actor violates due process when they misrepresent a fact "in order to" obtain a child's removal. 235 F.3d at 1020. Not just any misrepresentation will do under *Brokaw*—it must be made with intent to secure the child's removal and therefore material to the removal determination. The Mabeses' strongest claim on this point arises from DCS's representation that Brian admitted to smoking marijuana when he was the only caregiver present with the children—a fact the state court referenced in upholding the removal of the children. Brian sees the point as overstated, underscoring that he *never* admitted to using marijuana when he was home alone with the children.

The Mabeses urge us to affirm the district court's denial of qualified immunity, characterizing the materiality of any statements in the CHINS Petition as "a question for the jury." But even absent Brian's alleged admission to using marijuana while being the only adult present, we return to our earlier determination that, in the totality of circumstances, based on the uncertain and urgent situation DCS encountered with the Mabeses, a reasonable official could have believed probable cause existed to support removing the children. This conclusion confirms that DCS's alleged misstatements were not material.

Because the Mabeses have failed to demonstrate that Natasha Davis, Courtney Oakes, or Hannah Lyman violated their clearly established rights and included false statements "in order to" secure the children's removal, the district court

committed error in not awarding these defendants qualified
immunity.

C

Finally, the Mabeses contend that Case Manager Natasha
Davis, Angela McFeeley (the case manager assigned to the
case on a permanent basis following the initial investigation),
Hannah Lyman (the supervisor), Courtney Crowe (the office
director), and Jaclyn Allemon (the regional DCS manager) vi-
olated their due process rights during the child protection
proceedings that followed the initial removal of the children.
The Mabeses also advance this claim against Kristin Miller
and Stephanie King, two other DCS employees, but we
quickly conclude that both are entitled to qualified immunity,
as the Mabeses acknowledged in their briefing before the dis-
trict court that neither defendant was "personally involved in
Plaintiffs' constitutional violations." And they take no con-
trary position on appeal.

As for the remaining defendants, Davis, McFeeley,
Lyman, Crowe, and Allemon, the Mabeses claim that the DCS
employees involved in the investigation (McFeeley and
Lyman in particular) failed to consider all available evidence,
including information which was exculpatory. In support of
their contention that this conduct violated their clearly estab-
lished constitutional rights, the Mabeses rely on *Dupuy v.
Samuels*, 397 F.3d 493 (7th Cir. 2005). There we held that an
investigator must "take into account *all* of the available evi-
dence that tends to show that abuse or neglect did *or* did not
occur," before determining "whether that totality of evidence
would cause a reasonable individual to believe that a child
was abused or neglected." *Id.* at 506. But, as we later clarified,
*Dupuy* "merely requires DCFS workers to consider

exculpatory evidence—not to treat it as dispositive." *Sebesta v. Davis*, 878 F.3d 226, 235 (7th Cir. 2017).

We see no record evidence supporting the Mabeses' assertion that any DCS official consistently ignored and disregarded evidence that did not fit their predetermination that the parents should be held accountable for L.M.'s condition. The Mabeses contend, for example, that the investigators never looked into the events that took place at the regional hospital. But McFeeley requested records from the regional hospital the same day Lyman assigned her to the case and then shared those records with medical professionals at Riley Hospital. And when the Mabeses submitted expert opinions and new evidence challenging DCS's substantiation of abuse in connection with Erika's Child Care Worker Assessment Review Process, Case Manager McFeeley consulted with Dr. Thompson and other physicians. Dr. Thompson explained that she disagreed with the Mabeses' suggestion that L.M.'s skull fracture was the result of birth trauma or an accident, rather than an acute injury caused by intentional contact or neglect.

In no way does the record demonstrate that Dr. Thompson or any DCS official closed their minds or became unwilling to consider new developments. As one example, after the radiologist who reviewed J.R.M.'s initial CT scan changed his assessment because he was unsure whether the scan evidenced a skull fracture, as he originally thought, Dr. Thompson also changed her assessment to "indeterminate for non-accidental trauma."

At the end of the day, beyond their claims that DCS ignored evidence and failed to conduct a diligent investigation, the Mabeses have put forth no evidence by which a

reasonable jury could conclude that Natasha Davis, Angela McFeeley, Hannah Lyman, Courtney Crowe, and Jaclyn Allemon violated their constitutional rights by conducting a biased investigation. See *Trahanas v. Nw. Univ.*, 64 F.4th 842, 858 (7th Cir. 2023) ("[B]are allegations, without more, do not create genuine disputes of material fact.").

The Mabeses also claim that the Child Care Worker Assessment Review Process violated their procedural due process rights because the review must be performed by an individual who was not involved in the underlying decision to substantiate allegations of abuse. Courtney Crowe, the local DCS office director who conducted the initial Review Process, was too involved in the investigation, the Mabeses claim, as was DCS employee Waylon James, a non-party to this suit, who conducted the second review. The Mabeses contend that defendant Jaclyn Allemon, the regional DCS manager, violated their procedural due process rights when she approved James's finding from the second Review Process substantiating abuse allegations against Erika.

The Mabeses are correct that we have recognized the importance of appointing a decision maker in child abuse proceedings who had "no part in the investigative process." *Dupuy*, 397 F.3d at 508. But while a "new decision-maker" is preferable, we have not clearly established that due process always entitles parents to administrative review by an official with no connection whatsoever to the underlying investigation. *Id.*; see *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018) (concluding that "[i]t is not enough that the rule is suggested by then-existing precedent" to be clearly established).

And we see no due process concern arising out of Crowe's or James's involvement in the Review Process. An impartial

decision maker is surely an important component of due process, but as the Supreme Court has acknowledged in the welfare context, "prior involvement in some aspects of a case will not necessarily bar [an official] from acting as a decision maker." *Goldberg v. Kelly*, 397 U.S. 254, 271 (1970). The same reasoning applies here. The Mabeses provide no basis to conclude that Crowe's limited prior involvement—corresponding with her role as the local office director overseeing all ongoing investigations and providing updates to her manager—compromised her ability to impartially evaluate the claims against Erika. The same is true for James, who the Mabeses claim developed a conflict of interest after he ordered the local DCS office to reassess the case and update him on their position in advance of the second Review Process.

Because the Mabeses failed to allege any constitutional violation with respect to the DCS defendants' consideration of mitigating evidence and can point to no case clearly establishing their entitlement to a decision maker with no prior involvement in the investigation, no matter how benign or insignificant, we grant the defendants qualified immunity.

*          *          *

Cases like these are hard because they require us to balance a fundamental individual interest—the right to care for and have custody of one's child—against the state's interest in protecting young children from abuse. But we see this difficulty as inherent in the work of child protection officers, who often find themselves tasked with making difficult decisions on tight timelines that carry significant consequences. It is in a context like this one that qualified immunity has a particularly important role to play as it gives officials the "breathing room to make reasonable but mistaken judgments about

open legal questions." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011). And, applying our clearly established precedent, we see nothing plainly unreasonable in the actions taken by Dr. Thompson or the DCS defendants in the difficult circumstances they encountered with the Mabeses.

After conducting the fact-specific and individualized analysis that the law of qualified immunity demands, we conclude that all defendants are immune on all the plaintiffs' claims. We REVERSE the district court's judgment and REMAND for entry of judgment for the defendants.