In the

# United States Court of Appeals
## For the Seventh Circuit

No. 23-2552

DEREK THOMAS,

*Plaintiff-Appellant,*

*v.*

JACQUELINE CARMICHAEL, *et al.,*

*Defendants-Appellees.*

Appeal from the United States District Court for the
Southern District of Indiana, Terre Haute Division.
No. 2:21-cv-00160 — **James R. Sweeney II,** *Chief Judge.*

ARGUED MAY 28, 2025 — DECIDED JANUARY 23, 2026

Before RIPPLE, ST. EVE, and KOLAR, *Circuit Judges.*

KOLAR, *Circuit Judge.* Derek Thomas served part of his criminal sentence at the Federal Correctional Complex (FCC) in Terre Haute, Indiana. He alleges that, while housed there, he was attacked by his cellmate repeatedly and suffered serious injuries. He now brings claims against several prison officials from FCC Terre Haute under *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971). He says two of these officials violated the Eighth

Amendment by failing to protect him from his cellmate. And he says all defendants violated the Eighth Amendment by acting with deliberate indifference to his serious medical needs. The district court granted defendants summary judgment, and Thomas now appeals.

The facts of this case are disturbing. We take Thomas at his word—and the evidence certainly seems to suggest—that he was brutally attacked. And perhaps corrections officials could have done more to protect Thomas. But we are not asked to decide whether an attack occurred or whether corrections officials could have done more to prevent an attack. With a few nuances more fully discussed below, we are primarily confronted with two questions: (1) does Thomas present a claim previously recognized under *Bivens* or the very few cases to expand *Bivens*; and (2) can Thomas defeat the defendants' qualified-immunity defense even though he did not point to any clearly established law in the district court? Precedent precludes us from answering these questions in Thomas's favor. Thus, we affirm the district court's judgment.

## I. Background

We present the facts and draw all reasonable inferences in Thomas's favor, as he is the non-movant. *Taylor v. Schwarzhuber*, 132 F.4th 480, 486 (7th Cir. 2025).

### A. Underlying Facts

In 2014, Thomas was sentenced to fifteen years in prison after pleading guilty to production of child pornography. After he was sentenced, he moved among various prisons until, three years into his sentence, he was transferred to FCC Terre Haute. This prison has two facilities. One is the Federal

Correctional Institute (FCI) Terre Haute; the other is the United States Penitentiary (USP) Terre Haute.

Officials originally placed Thomas in the general population of the FCI. The day he was placed in general population, inmates there asked about his conviction. When Thomas confessed he was a sex offender, the inmates told him to check into protective custody immediately or be killed. Thomas did so and was sent to the Special Housing Unit (SHU) within the FCI.

Even while in the SHU, though, inmates sought to harm Thomas by tainting his food with pebbles, staples, chicken bones, and shards of glass. Thomas told Dr. Jacqueline Carmichael, a psychologist at FCC Terre Haute (and a defendant here), that he could not eat his food because it was consistently tainted. A day after he said this, staff transferred Thomas to another SHU, this one within the USP.

About two weeks after he was transferred, Thomas was placed in a cell with a man whose initials are G.L. Things became violent once G.L. learned that Thomas was a sex offender. Within thirty minutes of their meeting, G.L. beat Thomas unconscious and threatened to kill him if he reported the beating. Thomas tried to covertly tell staff about this beating by slipping a note under his cell door as G.L. slept. The note went unanswered, though Dr. Erin Conner, a psychologist in the SHU at the USP (and a defendant here), later told Thomas she saw the note.

A week after this first beating, Thomas told his correctional counselor, Tracy Joslyn (also a defendant here), about the attack. She reportedly replied: "you don't get to pick who you cell with. You're going back[.]" In the following days,

G.L. beat Thomas multiple times and knocked out two of his teeth.

Around two weeks after Thomas told Counselor Joslyn about G.L.'s violence, Thomas and G.L. were transferred together to the SHU in the FCI. They remained cellmates. A few days after this transfer, G.L. choked Thomas unconscious. Thomas then wrote to Dr. Carmichael directly—again slipping a note under his cell door while G.L. slept—that G.L. was beating him. Dr. Carmichael later admitted receiving this letter. During Dr. Carmichael's rounds the following week, Thomas covertly showed her his bruises. He mouthed "help me" and, pointing to G.L., said "beating me[.]" In response, Dr. Carmichael held up a clipboard that read "do you need [Special Investigative Services] to pull you out?" to which Thomas said "yes[.]"

But Thomas was not removed from his cell and alleges that, later that day, G.L. beat him, choked him unconscious, and then raped him. In a later interview with officials, Thomas described waking up on his bunk—after G.L. choked him—with his pants down, ointment on his anus, and pain in his rectum. From this, Thomas said, he "deduce[d] that [he] had been raped." During Dr. Carmichael's rounds the next week, Thomas told her G.L. had raped him. Dr. Carmichael told Thomas she understood and that she was forwarding his earlier note to her boss. Later that day, Thomas was removed from his cell and placed in a new cell.

The day after he was removed from his cell, Thomas posted a request for medical attention on his cell door using a standard form. In it he said he had "injuries and blood in [his] stools." That same day he also wrote to Dr. Carmichael asking to speak with her because he was not sleeping and was "still

in shock." Two days after sending her this note, he sent her another.

The next week, Thomas told Counselor Joslyn he had been raped and asked for medical and psychological treatment. He also asked for a grievance form to complain that he had not yet been seen by any medical staff. A week after this conversation, Counselor Joslyn gave him a grievance form.

After receiving a report that Thomas was suicidal, Dr. Carmichael met with Thomas and conducted a suicide risk assessment. Thomas testified he told Dr. Carmichael about the rape, but her report does not reflect this information. Her report states Thomas denied suicidality, and that she concluded Thomas was a "low" acute suicide risk.

The same month Dr. Carmichael assessed Thomas, Thomas filed a grievance about the rape, which prompted Dr. Conner and Special Investigative Services Lieutenant Jamie Baker (a defendant in this case) to interview him. The same day he was interviewed, Thomas saw Nurse Matthew Worthington (another defendant), who explained that he could not collect any evidence of the rape given how much time had passed. Though Thomas showed Nurse Worthington his broken teeth and bruises, Thomas claims Nurse Worthington did not physically examine him.

After Thomas disclosed the rape in a letter to outside entities, he underwent another evaluation by Nurse Corey Pointer (another defendant) as part of the protocol mandated by the Prison Rape Elimination Act. Thomas testified that Nurse Pointer's evaluation was "humiliating," because he was ordered to disrobe in front of correctional officers who then laughed at him. Thomas also said that he asked Nurse

Pointer to refer him to a dentist and to physicians who could treat his abdominal and shoulder injuries but that Nurse Pointer did not do so. Nurse Pointer's report states he did not find any injuries during his exam.

Shortly thereafter, in February 2018, Thomas was transferred to a different federal correctional complex.

## B. Procedural History

Thomas filed a *pro se* complaint in federal district court. He alleged he suffered physical and psychological pain because of his treatment at FCC Terre Haute, including lost teeth, pain in his shoulder and abdomen, aggravation of a preexisting hernia, and post-traumatic stress disorder.

The district court screened Thomas's amended complaint and permitted him to proceed with his claim that Dr. Carmichael and Counselor Joslyn failed to protect him in violation of the Eighth Amendment. The court also allowed him to proceed with his claim that Drs. Carmichael and Conner, Counselor Joslyn, Lieutenant Baker, and Nurses Pointer, Worthington, and Karl Norris[1] were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment. After denying Thomas's request to recruit counsel, the district court reconsidered and recruited counsel for him.

The defendants moved for summary judgment in March 2023, arguing (among other things) that qualified immunity barred Thomas's deliberate-indifference claim. At this point

---

[1] Thomas names Nurse Norris as a defendant but does not discuss him further on appeal. He thus fails to present an argument that Nurse Norris was personally involved in his delayed treatment, *see Est. of Miller by Chassie v. Marberry*, 847 F.3d 425, 428 (7th Cir. 2017), so we do not consider this claim further.

Thomas's relationship with recruited counsel deteriorated. After the district court denied counsel's first motion to withdraw, counsel filed a response to the defendants' motion for summary judgment, though this response did not address qualified immunity. Thomas, in a letter to the court, took issue with other aspects of his counsel's response, "disavow[ed]" it, and sought more time to review it with counsel. In response, the magistrate judge directed that, were Thomas to proceed without counsel, he would need to file his own response within seventeen days of the magistrate judge's order. In addressing Thomas's specific complaints, the magistrate judge commented counsel's response was "competent," though the court expressed "nothing as to the merits" of the response. Thomas later "verified that he wishe[d] to proceed with recruited counsel's response" to summary judgment.

Ultimately, the district court granted defendants summary judgment. The court concluded that Thomas could not bring his failure-to-protect claim at all. The claim, the court held, presented a new *Bivens* context and special factors counseled against the judicial creation of a new damages remedy. As for Thomas's deliberate-indifference claim, the court concluded defendants were entitled to qualified immunity. By failing to address qualified immunity in opposing summary judgment, the district court said, Thomas had not met his burden of defeating the defense. Alternatively, the court said it would dismiss this claim even were it to consider it. Like his failure-to-protect claim, the court determined Thomas's deliberate-indifference claim presented a new *Bivens* context for which a new remedy was not warranted.

Thomas, *pro se*, filed a timely notice of appeal. After re-
viewing the appeal, we recruited counsel for him and set the
case for oral argument.[2]

## II. Discussion

We review a district court's grant of summary judgment
*de novo*, viewing all facts and drawing all reasonable infer-
ences in the light most favorable to Thomas. *See Taylor*, 132
F.4th at 486. Summary judgment is proper if "there is no gen-
uine dispute as to any material fact" and the moving party "is
entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

We proceed in two steps. First, we address whether
Thomas can bring his failure-to-protect claim under *Bivens*.
We conclude he cannot. Second, we address whether Thomas
may oppose the defendants' qualified-immunity defense on
appeal after failing to oppose qualified immunity before the
district court. We conclude he may not. Thus, we affirm the
district court's judgment in favor of defendants.

### A. Failure to Protect

Thomas alleges that Dr. Carmichael and Counselor Joslyn
violated the Eighth Amendment by failing to protect him
from G.L. Whether he can proceed on this claim turns on
whether permitting his claim would create a new private
right of action under *Bivens*. But we recently declined to per-
mit a *Bivens* claim like Thomas's because it would impermis-
sibly expand *Bivens*. Thus, binding precedent compels us to
affirm the district court's judgment dismissing this claim.

---

[2] We thank recruited counsel for their able written and oral advocacy.

In *Bivens*, the Supreme Court inferred a private right of action to sue federal officials under the Fourth Amendment. It permitted a plaintiff, who alleged agents from the Federal Bureau of Narcotics violated his rights under the Fourth Amendment, to sue the agents for damages. *Bivens*, 403 U.S. at 397. The Supreme Court later expanded *Bivens* to include two other private rights of action against federal authorities. In *Davis v. Passman*, the Court implied a claim, based on the Fifth Amendment, against a congressman who allegedly discriminated against a staffer because of her sex. 442 U.S. 228 (1979). Then in *Carlson v. Green*, the Court implied a claim, based on the Eighth Amendment, against prison officials who allegedly provided a plaintiff inadequate medical care. 446 U.S. 14 (1980).

The Court, however, has not expanded *Bivens* since *Carlson*. *Egbert v. Boule*, 596 U.S. 482, 491 (2022). "For the past 45 years," the Court recently observed, it "has consistently declined to extend *Bivens* to new contexts." *Goldey v. Fields*, 606 U.S. 942, 945 (2025) (per curiam). The Court's most recent decisions effectively limit any effort to expand *Bivens* beyond its present scope. "At bottom," the Court has said, "creating a cause of action is a legislative endeavor[,]" not one for courts. *Egbert*, 596 U.S. at 491. Put differently, recognizing a new cause of action under *Bivens* is now "a disfavored judicial activity." *Id.* (quoting *Ziglar v. Abbasi*, 582 U.S. 120, 135 (2017)).

Nonetheless, to determine whether to permit a claim under *Bivens*, we engage in a two-step analysis. At bottom, both steps "often resolve to a single question: whether there is any reason to think that Congress might be better equipped to create a damages remedy." *Id.* at 492.

At step one, we ask whether a plaintiff presents a new claim under *Bivens*—one that is "different in a meaningful way from" *Bivens*, *Davis*, or *Carlson*. *Ziglar*, 582 U.S. at 139–40; *see Egbert*, 596 U.S. at 492–93. A meaningful difference might include "the rank of the officers involved[,]" "the constitutional right at issue[,]" or "the risk of disruptive intrusion by the Judiciary into the functioning of other branches[,]" among other things. *Ziglar*, 582 U.S. at 140. If we determine the claim is the same as *Bivens*, *Davis*, or *Carlson*, it may go forward and we need not reach step two. *Id.*

But if a plaintiff instead presents "a new *Bivens* context," at the second step we must determine whether "the Judiciary is at least arguably less equipped than Congress to 'weigh the costs and benefits of allowing a damages action to proceed.'" *Egbert*, 596 U.S. at 492 (quoting *Ziglar*, 582 U.S. at 136, 139). To do so we ask whether there are any "special factors counseling hesitation in the absence of affirmative action by Congress." *Ziglar*, 582 U.S. at 135 (quoting *Carlson*, 446 U.S. at 18).

At step one, Thomas argues his failure-to-protect claim does not present a new *Bivens* context. In support, he compares his claim to the ones in *Farmer v. Brennan*, 511 U.S. 825, 830 (1994), and *Carlson*, 446 U.S. at 14. But our circuit has already decided that claims like Thomas's are foreclosed by Supreme Court precedent. *Sargeant v. Barfield*, 87 F.4th 358 (7th Cir. 2023).

In *Sargeant*, the plaintiff brought an action under *Bivens* alleging that a prison official failed to protect him by placing him "in cells with prisoners that [the official] knew were violent." *Id.* at 361. The plaintiff in *Sargeant* argued the Supreme Court's decision in *Farmer*—addressing a claim that prison officials violated the Eighth Amendment by failing to protect a

plaintiff from other inmates—showed that *Bivens* covered his claim. *Id.* We disagreed. We noted the Court in *Farmer* merely assumed, but did not decide, that the plaintiff had a *Bivens* remedy for her failure-to-protect claim. Accordingly, we concluded, *Farmer* did not establish a new *Bivens* context. *Id.* at 365. "Not once has the Supreme Court mentioned *Farmer*" in subsequent cases reciting available *Bivens* claims, we observed. *Id.* And, we added, "it would have if *Farmer* created a new context or clarified the scope of an existing one." *Id.* "A silent assumption in an opinion cannot generate binding precedent." *Id.* Thus, to the extent Thomas relies on *Farmer* to argue we should permit his *Bivens* failure-to-protect claim against Dr. Carmichael and Counselor Joslyn, *Sargeant* forecloses this argument.[3]

*Sargeant* also forecloses Thomas's reliance on *Carlson*. After rejecting the plaintiff's reliance on *Farmer* in *Sargeant*, we held that his claim differed in a meaningful way from *Carlson*. *Id.* at 366–67. We explained that a claim involving an inmate being housed with violent prisoners "arose in a different prison setting" from *Carlson*, where the inmate received insufficient medical treatment following an asthma attack. *Id.* at 366. Plaintiff's failure-to-protect claim, we said, would "invariably implicate housing policies, which factor in a sensitive mixture of things we are ill-positioned to assess—a prison's determinations about safety, discipline, and resources." *Id.* at

---

[3] *Sargeant* is consistent with the decisions reached by our sister circuits. *See Fisher v. Hollingsworth*, 115 F.4th 197, 206 (3d Cir. 2024) (declining to extend a *Bivens* remedy to the failure-to-protect context); *Bulger v. Hurwitz*, 62 F.4th 127, 139–42 (4th Cir. 2023) (same); *Chambers v. Herrera*, 78 F.4th 1100, 1105–07 (9th Cir. 2023) (same); *Johnson v. Terry*, 119 F.4th 840, 856, 862 (11th Cir. 2024) (same).

367. Such failure-to-protect claims, we observed, "would interfere with a vastly different part of prison operations—housing assignments instead of medical care"—and would thus "threaten[] to intrude in ways *Carlson* did not contemplate." *Id.* Putting these differences aside, we also explained that Congress's creation of an alternative remedial scheme in the Prison Litigation Reform Act suggested that the judiciary was comparatively less equipped to recognize a new damages remedy. *Id.* at 367–68.

Thomas attempts to distinguish his case from *Sargeant*. He asserts that because he has already been transferred to a new facility and the defendants are not responsible for housing decisions, his claim "would not impact prison housing policies[.]" But we do not understand the Supreme Court's precedent to require, or even permit, such granular distinctions. Allowing inmates to pursue damages under *Bivens* for failure-to-protect claims implicates prison housing policies, regardless of whether a particular plaintiff has since been transferred to a new facility. Moreover, the special factors that counseled hesitation in *Sargeant* apply with equal force here: the Prison Litigation Reform Act and prison grievance system provide inmates like Thomas with an alternative remedial path.

Thus, like the plaintiff's claim in *Sargeant*, Thomas's failure-to-protect claim "cannot go forward" under present Supreme Court precedent "because it presents separation-of-powers concerns and special factors not accounted for by any of the Supreme Court's three *Bivens* precedents." *Sargeant*, 87 F.4th at 369.

### B. Deliberate Indifference

We turn next to Thomas's deliberate-indifference claim. He alleges all defendants were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment. Because we agree with the district court that Thomas failed to show defendants are not entitled to qualified immunity, we affirm. Since we affirm on this basis, we do not address whether Thomas's claim presents a new *Bivens* context.

In suing a government official for a constitutional violation, a plaintiff must overcome qualified immunity, which shields a government official from liability unless she violates clearly established law. *Tousis v. Billiot*, 84 F.4th 692, 697 (7th Cir. 2023). "Qualified immunity is an affirmative defense, but once the defendant raises it, the burden shifts to the plaintiff to defeat it." *Taylor v. City of Milford*, 10 F.4th 800, 806 (7th Cir. 2021) (cleaned up). To determine whether qualified immunity attaches, we ask: (1) "whether the facts, taken in the light most favorable to the party asserting the injury show that the [official's] conduct violated a constitutional right," and (2) "whether the right at issue was 'clearly established' at the time of the [official's] alleged misconduct." *Tousis*, 84 F.4th at 697 (cleaned up). If the answer under either prong is "no," immunity attaches and bars a plaintiff's claim. Qualified immunity is a question of law, *Smith v. Finkley*, 10 F.4th 725, 734 (7th Cir. 2021), though whether it applies is fact intensive, *Anderson v. Creighton*, 483 U.S. 635, 641 (1987); *Mabes v. Thompson*, 136 F.4th 697, 713 (7th Cir. 2025).

In moving for summary judgment below, defendants invoked qualified immunity from plaintiff's deliberate-indifference claim. At this point, "the burden shift[ed] to the plaintiff to defeat it." *City of Milford*, 10 F.4th at 806 (citation

omitted). But in his response opposing summary judgment, Thomas did not address qualified immunity. The district court held that, by failing to address qualified immunity, Thomas necessarily failed to meet his "burden of defeating it."

Thomas acknowledges that his omission below means he either waived or forfeited this argument for appeal, though he urges us to address his argument anyway. We "generally do not consider issues raised for the first time on appeal." *Henry v. Hulett*, 969 F.3d 769, 786 (7th Cir. 2020) (en banc). An argument not raised below is either "waived or forfeited[.]" *Seats v. Nurse*, 152 F.4th 874, 881 (7th Cir. 2025). Waiver is the "intentional relinquishment or abandonment of a known right," whereas "forfeiture is the mere failure to raise a timely argument, due to either inadvertence, neglect, or oversight." *Henry*, 969 F.3d at 786 (citation omitted).

As we recently explained, "our ability to overlook waiver in civil cases" is "severely constricted." *Appvion, Inc. Retirement Savings & Employee Stock Ownership Plan v. Buth*, 99 F.4th 928, 954 (7th Cir. 2024). And though we can review a forfeited argument in a civil appeal for plain error, we do so only when "a party can demonstrate that: '(1) exceptional circumstances exist; (2) substantial rights are affected; and (3) a miscarriage of justice will occur if plain error review is not applied.'" *Henry*, 969 F.3d at 786 (citation omitted). We have sole discretion to decide which rare case meets this standard. *Id.* Since we decided *Henry*, we have reviewed forfeited arguments in civil appeals only a handful of times. *See, e.g., Hacker v. Dart*, 62 F.4th 1073, 1080–83 (7th Cir. 2023); *Bourgeois v. Watson*, 977 F.3d 620, 631 (7th Cir. 2020). And we have declined to apply plain-error review "in too many civil cases to count."

*Bronson v. Ann & Robert H. Lurie Children's Hosp. of Chicago*, 69 F.4th 437, 452 (7th Cir. 2023).

Thomas argues that, even if he waived his opposition to qualified immunity—even if he knowingly relinquished his argument below—we should review the argument on appeal. But in *Henry*, we held defendants waived their qualified immunity defense and thus declined to address the merits of the defense on appeal. 969 F.3d at 786. We need not spend much time on waiver, however, because Thomas has clearly forfeited his argument.

And this is not one of those few cases where we will review a forfeited argument for plain error. As noted above, we may review a forfeited argument in a civil case only rarely, and do so only if, among other things, we determine "exceptional circumstances exist[.]" *Id*. (citation omitted). Thomas argues exceptional circumstances exist here because of his difficulties below with his counsel during summary-judgment proceedings. As our dissenting colleague explains, Thomas faced a difficult choice on a tight deadline. But Thomas has cited no case, and we have found none, finding exceptional circumstances based on the facts leading to the forfeiture. Rather, whether exceptional circumstances exist generally gets at broader, systemic concerns. We have said that "these circumstances include when a forfeited ground is 'founded on concerns broader than those of the parties,'" such as comity, federalism interests, and the conservation of judicial resources. *Bourgeois*, 977 F.3d at 631 (citation omitted). An example is "a statutory-construction question that has the potential to affect large numbers of people beyond the parties [in a given] case." *CNH Indus. America LLC v. Jones Lang LaSalle Americas, Inc.*, 882 F.3d 692, 705 (7th Cir. 2018).

Thomas's forfeited argument does not present concerns beyond his case, like a far-reaching question of law, comity, or federalism. It, like most qualified-immunity analyses, is a fact-specific inquiry that would not "resolve issues of great significance for other parties." *Hacker*, 62 F.4th at 1082. We do not dispute that this case is of the utmost importance to Thomas. And we have considered the unfortunate circumstances here: that Thomas's recruited counsel, with whom he clashed, did not address qualified immunity; and that the magistrate judge, in addressing different complaints Thomas had with his counsel's summary-judgment response, commented favorably on the response. But we cannot conclude exceptional circumstances exist here given that Thomas, like all civil litigants, has no right to counsel in a civil case. *See Turner v. Rogers*, 564 U.S. 431, 441 (2011). And because Thomas cannot show exceptional circumstances are present here, we cannot apply plain-error review to his forfeited argument.

To be sure, this is a harsh result for Thomas. But we observe our rules of appellate preservation strictly to be fair to all litigants, present and future. We do not address late-stage arguments so that "the opposing party is not prejudiced by being denied sufficient notice to respond to an argument." *Henry*, 969 F.3d at 785 (quoting *Hernandez v. Cook County Sheriff's Off.*, 634 F.3d 906, 913 (7th Cir. 2011)). Reviewing Thomas's argument despite his forfeiture would undoubtedly prejudice the defendants here.

Considering Thomas's argument would short-circuit our established process to litigate qualified immunity. Once the defense of qualified immunity is raised, a defendant is entitled to dismissal unless a plaintiff comes forward with facts

showing a constitutional violation and law showing his right was "clearly established" at the time of the alleged violation. *Siddique v. Laliberte*, 972 F.3d 898, 902–03 (7th Cir. 2020). As we have explained: "The *plaintiff* bears the burden of demonstrating that a right was clearly established at the time the alleged violation occurred." *Green v. Newport*, 868 F.3d 629, 633 (7th Cir. 2017) (emphasis added). And though qualified immunity is a question of law whether it applies is fact bound. *Anderson*, 483 U.S. at 641; *Mabes*, 136 F.4th at 713. Allowing a plaintiff to attempt to meet his burden for the first time on appeal risks inviting factual questions that a defendant may not have had the opportunity to litigate below. *Cf. Allen v. City of Chicago*, 865 F.3d 936, 944 (7th Cir. 2017). And we appreciate the dissent's view that the context surrounding Thomas's forfeiture counsels for an exercise of our discretion to consider his argument. But excusing Thomas's forfeiture based on the breakdown of his relationship with his counsel would deny his opponents a key procedural protection. Addressing Thomas's argument now would deprive defendants of the procedural protections our qualified-immunity precedent affords them.

In the interest of "maintain[ing] the efficiency, fairness, and integrity of the judicial system for all parties," we must uphold our general rule of not considering arguments raised for the first time on appeal. *Boyers v. Texaco Ref. & Mktg.*, Inc., 848 F.2d 809, 812 (7th Cir. 1988). For, especially in questions that are fact bound, "[t]o reverse the district court on grounds not presented to it would undermine the essential function of the district court." *See id.* Because Thomas failed to meet his burden to defeat qualified immunity, we affirm summary judgment on Thomas's deliberate-indifference claim.

### III. Conclusion

For the foregoing reasons, we AFFIRM.

RIPPLE, *Circuit Judge*, dissenting in part. I respectfully dissent from the panel majority's decision to affirm the grant of qualified immunity to Nurses Pointer and Worthington.

### A.

In his response to the defendants' motion for summary judgment, Mr. Thomas failed to respond to the defendants' assertion that they were entitled to qualified immunity. Such an omission generally renders any opposition to qualified immunity waived or forfeited.[1] However, we have discretion to resolve issues raised for the first time on appeal. *Singleton v. Wulff*, 428 U.S. 106, 121 (1976).[2] In this case, the particular circumstances before us warrant a favorable exercise of that discretion.

Context matters. The defendants moved for summary judgment on March 16, 2023, raising a defense of qualified immunity against Mr. Thomas's deliberate indifference claim. Mr. Thomas's relationship with appointed counsel deteriorated as the deadline for filing his summary judgment response neared. After the district court denied counsel's first motion to withdraw, counsel filed a response to the defendants' motion for summary judgment that did not address directly the defendants' qualified immunity defense. Although

---

[1] *See Nichols v. Michigan City Plant Plan. Dep't*, 755 F.3d 594, 600 (7th Cir. 2014) ("The non-moving party waives any arguments that were not raised in its response to the moving party's motion for summary judgment."); *Hacker v. Dart*, 62 F.4th 1073, 1080 (7th Cir. 2023) ("Ordinarily, we will not consider arguments forfeited by a civil litigant.").

[2] *See also Sebesta v. Davis*, 878 F.3d 226, 234 (7th Cir. 2017) (reaching the merits rather than resting on forfeiture, even though the plaintiff never addressed the defendants' qualified immunity defense in the district court).

he did not address that omission, Mr. Thomas took issue with other aspects of counsel's filing and "disavow[ed]" it, seeking more time to review it with counsel.[3] In response, the magistrate judge issued an order directing that, were Mr. Thomas to proceed pro se and disavow reliance on his counsel's opposition to summary judgment, he would have sixteen days to file his own pro se response to the motion for summary judgment. Notably, in the text of the order, the magistrate judge also wrote that counsel's filing was *"competent and advocate[d] for Mr. Thomas in an appropriate manner."*[4]

Mr. Thomas therefore found himself faced with a difficult decision. He had to prepare, in a matter of days, his own response, or he had to proceed with the existing response prepared by counsel, a response that the magistrate judge explicitly had deemed "competent."[5] Mr. Thomas reasonably chose the latter path. The majority's opinion does not reckon with the influence that a magistrate judge's guidance would have on a pro se litigant, characterizing it instead as a matter of a "difficult choice on a tight deadline." *Thomas*, Slip Op. at 15. Although the magistrate judge purported to "express[] nothing as to the merits,"[6] her comments, when read in context, could well have led Mr. Thomas to believe that counsel's response was adequate to protect his rights with respect to qualified immunity. Under these circumstances, I would reach the merits of the qualified immunity claim. The "efficiency, fairness, and integrity of the judicial system for all parties"

---

[3] R.291 at 4.

[4] R.295 at 1 (emphasis added).

[5] R.295 at 1.

[6] *Id.*

requires no less. *Thomas*, Slip Op. at 17 (cleaned up). The panel majority's insistence that "exceptional circumstances" generally is limited to cases presenting broad systemic concerns simply cannot be squared with this standard.

**B.**

Because I would reach the merits of the qualified immunity defense, I must first examine whether Mr. Thomas's deliberate indifference claim can survive in light of the Supreme Court's recent clarification of the boundaries of the *Bivens* doctrine. It is a question that need not detain us long. The basic viability of Mr. Thomas's deliberate indifference claim may be resolved at the first step of the methodology prescribed by the Supreme Court. In *Carlson*, the Supreme Court recognized an implied damages remedy for an inmate who had received constitutionally inadequate medical care. *Carlson v. Green*, 446 U.S. 14, 18–19 (1980). First in *Brooks v. Richardson*, 131 F.4th 613 (7th Cir. 2025), and later in *Watkins v. Mohan*, 144 F.4th 926 (7th Cir. 2025), we confirmed that "*Carlson* remains good law" and allows federal prisoners to bring *Bivens* claims when prison officials act with deliberate indifference to their serious medical needs. *Watkins*, 144 F.4th at 931; *Brooks*, 131 F.4th at 615. Accordingly, our precedent establishes that Mr. Thomas's case does not arise in a new context but rather exists within the confines of *Carlson*.[7] I would adhere to that precedent today.

---

[7] The district court based its determination that Mr. Thomas's claim arose in a new *Bivens* context on the fact that his medical situation was not emergent and did not prove fatal. The district court's summary judgment order, issued in 2023, predated *Watkins*, where we clarified that non-emergent medical situations fall within the purview of *Carlson*. *Watkins v. Mohan*, 144 F.4th 926, 936 (7th Cir. 2025) ("*Carlson* thus also dealt with

Next, I must examine whether any of the defendants may benefit from the protection of the qualified immunity defense. Qualified immunity protects public officials "from liability for reasonable mistakes made while performing their public duties." *Findlay v. Lendermon*, 722 F.3d 895, 899 (7th Cir. 2013). "The doctrine 'balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably.'" *Sabo v. Erickson*, 128 F.4th 836, 843 (7th Cir. 2025) (en banc) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)).

To prevail on a deliberate indifference claim, a plaintiff must prove (1) that he had an objectively serious medical condition (2) to which the individual defendant was deliberately indifferent. *Petties v. Carter*, 836 F.3d 722, 727–28 (7th Cir. 2016) (en banc). To defeat a qualified immunity defense, in addition to showing that the defendant official was deliberately indifferent to the plaintiff's serious medical need, the plaintiff must establish that the right was clearly established at the time of the challenged conduct. *Sabo*, 128 F.4th at 843; *Orlowski v. Milwaukee County*, 872 F.3d 417, 421 (7th Cir. 2017). A "right is clearly established when the law is sufficiently clear that every reasonable official would understand that what he is doing is unlawful." *Sabo*, 128 F.4th at 843–44 (citation modified) (quoting *District of Columbia v. Wesby*, 583 U.S.

---

management of a chronic, non-emergent medical condition requiring continuous, periodic treatment over many months."); *see also Brooks v. Richardson*, 131 F.4th 613, 615 (7th Cir. 2025) ("As for the duration of the poor care or the gravity of the condition: these seem more pertinent to the merits than to determining the scope of the holding in *Carlson*.").

48, 63 (2018)).[8] Accordingly, qualified immunity shields the defendant official from liability unless he had notice that he was violating the plaintiff's clearly established right.

I therefore must examine the record to determine whether any of the defendants were deliberately indifferent to Mr. Thomas's serious medical needs. *See Petties*, 836 F.3d at 728; *see also Estelle v. Gamble*, 429 U.S. 97, 106 (1976). A prison official acts with deliberate indifference "when he knows of a substantial risk of harm to an inmate and either acts or fails to act in disregard of that risk." *Arnett v. Webster*, 658 F.3d 742, 751 (7th Cir. 2011); *accord Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Inexplicably delaying an inmate's treatment when the delay exacerbates the inmate's injury or prolongs unnecessarily his pain can constitute deliberate indifference. *Petties*, 836 F.3d at 730–31.[9] An inmate may also establish deliberate indifference by demonstrating that prison officials persisted with an ineffective course of treatment. *Riley v. Waterman*, 126 F.4th 1287, 1296 (7th Cir. 2025).[10]

---

[8] *Accord Campbell v. Kallas*, 936 F.3d 536, 545 (7th Cir. 2019) (explaining that "[t]he principle of fair notice pervades the doctrine").

[9] *See also Goodloe v. Sood*, 947 F.3d 1026, 1032 (7th Cir. 2020) (determining that a three-month delay in arranging for an inmate to see a specialist supported the inmate's claim of deliberate indifference); *Perez v. Fenoglio*, 792 F.3d 768, 778–79 (7th Cir. 2015) (concluding that an inmate's "ten-month delay" in receiving "meaningful treatment" stated a claim for deliberate indifference).

[10] *See also Greeno v. Daley*, 414 F.3d 645, 654–55 (7th Cir. 2005) (determining that a jury could find deliberate indifference where the medical defendants ignored an inmate's requests for treatment, declined to conduct necessary testing, and administered ineffective medication).

"Qualified immunity is an individual defense available to each individual defendant in his individual capacity." *Est. of Williams by Rose v. Cline*, 902 F.3d 643, 651 (7th Cir. 2018) (quoting *Bakalis v. Golembeski*, 35 F.3d 318, 326–27 (7th Cir. 1994)). I therefore must examine the record as it pertains to each defendant. *See, e.g.*, *Petties*, 836 F.3d at 731–33 (evaluating separately the actions of individual defendants to determine whether each was deliberately indifferent). Moreover, I must undertake this scrutiny at a sufficient level of particularity to make a meaningful evaluation of each defendant's right to the qualified immunity defense. *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011) (reiterating that clearly established law should not be defined "at a high level of generality"); *see also Campbell v. Kallas*, 936 F.3d 536, 546 (7th Cir. 2019) (rejecting as "far too general" the framing of an inmate's Eighth Amendment rights for purposes of the clearly established inquiry and explaining that "broad principles" must have "been applied in a factual context specific enough to provide fair notice to the defendants that their conduct was unconstitutional").

### 1.

With these principles in mind, I turn first to Mr. Thomas's deliberate indifference claims against Nurses Pointer and Worthington.[11] In asserting the defense of qualified immunity, these defendant nurses emphasize the limited scope of their practice. They maintain that they "do not diagnose conditions, refer inmates to specialists, or provide any psychological or dental care."[12] This description of their practice

---

[11] Mr. Thomas's allegations with respect to these individuals are set forth in the statement of facts.

[12] Appellees' Br. 54.

limitations cannot serve as an entirely firm foundation for a qualified immunity defense.[13] For example, in *Berry v. Peterman*, 604 F.3d 435 (7th Cir. 2010), an inmate suffered a severe toothache, but medical staff did not refer him to a dentist for two months. *Id.* at 437. We determined that, even though the defendant nurse could not have referred the inmate to a dentist without further approval, the nurse nevertheless may have been deliberately indifferent because he could have contacted his supervisors "to voice any concerns" that he had with the doctor's lack of treatment. *Id.* at 443.

In keeping with *Berry*, a jury could find that Nurse Pointer was deliberately indifferent to Mr. Thomas's serious medical needs because he failed to forward any of Mr. Thomas's treatment requests to the appropriate prison providers, delaying Mr. Thomas's access to medical and dental care. Moreover, Nurse Worthington conducted a cursory examination of Mr. Thomas, failing to physically examine him even after seeing his broken teeth and bruised ribcage. Whether Nurse Worthington demonstrated deliberate indifference by failing to conduct a comprehensive medical examination when confronted with Mr. Thomas's injuries requires further exploration at trial. *See Greeno v. Daley*, 414 F.3d 645, 655 (7th Cir. 2005) (noting that the defendants' failure to conduct proper testing supported an inmate's deliberate indifference claim).

Finally, it was clearly established that medical staff, including nurses, cannot ignore requests for or delay an

---

[13] *See Perez*, 792 F.3d at 780 (concluding that an inmate stated a deliberate indifference claim against a nurse who had not provided him pain medication or stitched his sizeable wound due to the limited scope of her practice because the nurse could have contacted her supervisors to ensure that he received adequate care).

inmate's access to treatment. *See Berry*, 604 F.3d at 443; *Perez v. Fenoglio*, 792 F.3d 768, 780 (7th Cir. 2015). Nurses Pointer and Worthington had sufficient notice that they could not ignore Mr. Thomas's requests for or delay his access to treatment. Therefore, they are not entitled to qualified immunity.

**2.**

I now turn to Mr. Thomas's allegations against the staff psychologists, Drs. Carmichael and Conner. I first examine whether the summary judgment record would support a jury determination that Dr. Carmichael was deliberately indifferent to Mr. Thomas's serious medical needs. Certainly, a prison psychologist can violate the Eighth Amendment by withholding timely psychological care.[14] I need not decide in this case whether all psychological interventions fall within the ambit of *Carlson*; it is sufficient to note that the mental health care at issue here was necessitated by physical injury occurring because of sexual violence within the prison. It was as much "medical care" as suturing and bandaging a wound.

Assuming, as I must at this stage in the proceedings, that Dr. Carmichael received the notes Mr. Thomas submitted to her about G.L.'s assault and the resulting psychological harm he suffered, her failure to respond must be evaluated by the jury. In late November, Mr. Thomas communicated to her that he had been sexually assaulted and specifically requested to speak with her because he was "in shock" and thought he

---

[14] *See Blackmon v. Sutton*, 734 F.3d 1237, 1245–46 (10th Cir. 2013) (explaining that officials at a juvenile detention facility were not entitled to qualified immunity when they were "well aware of Mr. Blackmon's grave mental health problems" and "delayed or denied him access to mental health care").

was "going crazy."[15] There is no indication that she met with him or provided any form of treatment until nearly a month later. And their December encounter only occurred because Mr. Thomas had reported to a third party that he was experiencing suicidal ideations. A jury should evaluate whether these delays in treatment constituted deliberate indifference to Mr. Thomas's serious medical needs on Dr. Carmichael's part.

I turn now to whether the psychologists were deliberately indifferent to Mr. Thomas's concerns related to his physical health. "[A] prison official's decision to ignore a request for medical assistance" demonstrates deliberate indifference, though "an inmate is not required to show that he was literally ignored by prison staff." *Petties*, 836 F.3d at 729. Although tasked primarily with providing mental health care, psychologists can be liable for insufficient physical health care "if [they] acquiesce[] in the failure to provide necessary medical treatment." *Mitchell v. Kallas*, 895 F.3d 492, 498 (7th Cir. 2018).[16]

In *Mitchell*, we determined that a prison psychologist was not deliberately indifferent for her role in the prison's preventing a transgender inmate from accessing hormone therapy. *Id.* at 499. We reached this conclusion because the psychologist could not have expedited the inmate's request nor influenced the arbiters' final decision on whether to provide the requested treatment. *Id.* By contrast, on this record,

---

[15] R.274-1 at 72.

[16] *See also Lucas v. Turn Key Health Clinics, LLC*, 58 F.4th 1127, 1137 (10th Cir. 2023) (explaining that a prison official can be liable for "den[ying] access to someone capable of evaluating the inmate's need for treatment").

Drs. Carmichael and Conner could have expedited the provision of appropriate treatment for Mr. Thomas by referring his requests to be medically evaluated to the appropriate members of his care team. Even if they could not provide the appropriate care necessary to treat Mr. Thomas following G.L.'s assault, their decisions to ignore his requests for health care evince acquiescence to the lack of treatment Mr. Thomas received and therefore constitute deliberate indifference.

Although there is sufficient evidence for a jury to conclude that Drs. Carmichael and Conner violated Mr. Thomas's rights under the Eighth Amendment, I cannot say that the law was clearly established at the time the events took place. It is true that "[p]rison officials have been on notice for years that leaving serious medical conditions … untreated can amount to unconstitutional deliberate indifference." *Id.* And the serious nature of Mr. Thomas's post-traumatic stress disorder is not disputed here. With regard to Dr. Carmichael, however, it was not clearly established that she could run afoul of Mr. Thomas's Eighth Amendment rights by delaying for one month her provision of psychological treatment. Nor were Drs. Carmichael and Conner on notice that, as psychologists, their failures to refer Mr. Thomas's concerns related to his physical health were a violation of their constitutional duties. Therefore, Drs. Carmichael and Conner are entitled to qualified immunity.

**3.**

Lastly, I turn now to the non-medical defendants in Mr. Thomas's case, Lieutenant Baker and Counselor Joslyn. Although "[n]on-medical defendants cannot simply ignore an inmate's plight," they are entitled to "rely on the expertise of

medical personnel." *Arnett*, 658 F.3d at 755.[17] In *Arnett*, a case manager referred an inmate to medical staff when the inmate requested a specific medication. *Id.* We concluded that the inmate failed to state a claim of deliberate indifference against the non-medical official. *Id.* at 756. As we explained, "Arnett doesn't allege that Parker condoned or approved the medical staff's alleged refusal to provide him medical care, impeded their ability to provide effective treatment, or was in a position to take corrective action." *Id.*

Applying these principles to Lieutenant Baker, I must conclude that the record will not support a finding that he was deliberately indifferent to Mr. Thomas's serious medical needs. Lieutenant Baker interviewed Mr. Thomas about the sexual assault allegations that Mr. Thomas had submitted in a grievance. Following protocol, Lieutenant Baker then had Nurse Worthington medically assess Mr. Thomas for injuries. As a non-medical official, Lieutenant Baker was not deliberately indifferent by relying on the expertise of medical personnel who he knew had evaluated Mr. Thomas.

Counselor Joslyn presents a different situation. A prison official's "intentionally denying or delaying access to medical care" evinces deliberate indifference. *Estelle*, 429 U.S. at 104–05; *accord Petties*, 836 F.3d at 729 (explaining that prison officials are deliberately indifferent when they "ignore a request

---

[17] *Accord Greeno*, 414 F.3d at 655–56; *see also Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004) ("If a prisoner is under the care of medical experts … a non-medical prison official will generally be justified in believing that the prisoner is in capable hands. This follows naturally from the division of labor within a prison.").

for medical assistance").[18] Mr. Thomas told Counselor Joslyn that he had been sexually assaulted. "Because medical and psychology services weren't responding to [his] requests for assistance,"[19] Mr. Thomas requested Counselor Joslyn's assistance in obtaining medical care and access to psychological services. The record reflects that the only responsive action Counselor Joslyn took was to provide him with a grievance form the following week. A jury could find that, given her responsibilities for Mr. Thomas's well-being and given that she was aware that medical staff were ignoring Mr. Thomas's requests for care, Counselor Joslyn's own inaction in response to his requests constitutes deliberate indifference. However, I must conclude that there was an absence of case law at a sufficient level of specificity to place Counselor Joslyn on notice that her failure to notify cognizant medical personnel constituted deliberate indifference. *See Campbell*, 936 F.3d at 546.

In sum, I would reach the merits of the defendants' assertion of qualified immunity. I would further hold that Nurses Worthington and Pointer are not entitled to qualified immunity for their alleged deliberate indifference to Mr. Thomas's serious medical needs. However, because clearly established law would not have notified Dr. Carmichael, Dr. Conner, or

---

[18] *Cf. Greeno*, 414 F.3d at 656 (determining that a non-medical official who "investigated" an inmate's complaints and "referred them to the medical providers who could be expected to address Greeno's concerns" was not deliberately indifferent but positing that "[p]erhaps it would be a different matter if Miller had ignored Greeno's complaints entirely"); *Board v. Farnham*, 394 F.3d 469, 485 (7th Cir. 2005) (affirming that two guards who refused a detainee his inhaler when he was having difficulty breathing were not entitled to qualified immunity).

[19] R.274-1 at 77.

Counselor Joslyn that their inaction constituted deliberate in-difference, they are entitled to qualified immunity. Lieutenant Baker, who relied on and deferred to medical providers who he knew evaluated Mr. Thomas, is also protected by qualified immunity. Therefore, I would affirm in part the judgment of the district court and reverse and remand in part.